## A99A1671. SHORES v. THE STATE.
(522 SE2d 515)

ELDRIDGE, Judge.

A Hall County jury convicted appellant, Patrick Shores, of seven counts of theft of services (felony), three counts of theft of services

(misdemeanor), and one count of theft by taking (felony).[1] Appellant appeals from the trial court's denial of his motion for new trial.

In the light most favorable to the verdict,[2] the evidence shows the following: In September 1994, appellant, together with two partners operating as SMC Motorsports, L.P. ("SMC"), purchased Lanier Raceway in Hall County. Appellant was primarily responsible for promotion and race operations. In June 1995, SMC filed a petition for bankruptcy.[3] At the time bankruptcy was filed, SMC had a monumental amount of debt. Some operating expenses had been paid that would allow SMC to keep the doors open and the drivers and spectators coming in, but SMC had not paid any of the mortgage payments and very little on payroll and other taxes. After filing bankruptcy, the debt structure of SMC did not improve. SMC paid no mortgage payments, made only part of their tax payments, and owed thousands of dollars to various vendors.

Even though the race track was operating without any capital and had massive pre-bankruptcy and post-bankruptcy debts, a decision was made to proceed with the final race of the 1995 season. This final race, which occurred over a four-day period from October 26 through 29, 1995, was unsuccessful. Only a few race cars and drivers participated in each event, and there were not many spectators in the stands. On Saturday there were only about 200 spectators. On Sunday, the day of the large races, only between 150 and 200 people were in the stands.

Jeffery Sliz, an attorney and operator of a competing track, testified that an owner of a race track can tell if a race is going to be profitable prior to the beginning of the race. Sliz further testified that it was apparent early in the weekend that, based on the number of spectators and the low turnout of race cars, there would not be enough money from the weekend to meet race expenses. Some of the drivers testified to the same effect. Fred Query, Jr., a race car driver, testified that he wrecked his car the first night of practice and had to return home to North Carolina to bring back his other car; that he was concerned, due to the low number of cars at the track, the race would not go forward; and that appellant assured him on two separate occasions that the race would go forward and that he would be paid if he won. Wayne Willard, another race car driver, testified that, due to the low number of race cars and spectators, he felt that the race would not be profitable and urged appellant either to call off the

---

[1] The trial court directed a verdict to the remaining counts.

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] Initially, SMC filed a petition for Chapter 11 bankruptcy. On motion of creditors, about six months after SMC filed bankruptcy, the bankruptcy court appointed a Chapter 11 trustee and converted SMC's bankruptcy petition to Chapter 7.

race or to scale back the race. Willard testified that appellant refused and stated that everything was fine.

Further, appellant testified that during the last race of the weekend, he and his partners knew that they would be unable to cover the purses owed to the winning racers. However, knowing that there were insufficient funds in SMC's checking account and that they did not have funds available to deposit into the account to cover the amount of the checks, they issued checks to various winners of the races on Sunday night. Early the next morning, appellant and his partners instructed their bank to "stop payment" on the checks they had written.

Wayne Willard, Fred Query, Jr., Allen Craig Willard, Jimmy Garmon, Larry James Killingsworth, Jr., Greg Garrison, Jeff Bradford, and Christopher Wingo testified that they received checks for the amount of the winning purses they were entitled to and that, when they presented their checks to the bank, they were denied payment because a stop payment had been entered on each of the checks. All these victims further testified that, at the time of trial, they had not received payment for the amount they were owed. Based on this testimony, the jury found appellant guilty of six counts of theft of services (felony) and two counts of theft of services (misdemeanor).

Partially unpaid was George Echols, President of American Winged Outlaws Sprint Car Association. Pursuant to a written contract with appellant and his partners, the Winged Outlaws raced on Friday and Saturday nights. The contract provided for an advance cash payment each night. Appellant and his partners made Friday's payment timely, in cash. On Saturday, appellant and his partners did not have sufficient cash to pay Echols. In order to induce Echols to go forward with the show, appellant and his partners convinced Echols to accept the remaining portion of his payment by check, knowing there were insufficient funds in their checking account. Appellant and his partners specifically promised Echols that there were sufficient funds in their checking account to cover the check. Echols accepted a check in the amount of $6,500. When Echols presented the check to the bank where SMC maintained its account, there were insufficient funds in SMC's checking account to cover the amount of the check. When Echols re-presented the check for payment, appellant and his partners had placed a stop payment on the check. Echols testified that he had not received payment for the amount of the check at the time of trial. The check given to Echols was the basis for a conviction of an additional count of felony theft of services.

The State also put up evidence that several law enforcement officers who worked security were not paid by appellant and his partners. These individuals were normally paid a week after they worked

and testified that they never received checks for the last race. The failure to pay John Marshall, a Hall County deputy sheriff, was the basis for a conviction of misdemeanor theft of services.

Also unpaid was Bearden Oil Company, which delivered, for cash on delivery, 1,200 gallons of race fuel to Lanier Raceway prior to this race event. Appellant was found guilty of theft by taking for his unlawful appropriation of this fuel without payment. *Held*:

1. Appellant asserts that the trial court erred in entering a judgment of conviction.

(a) OCGA § 16-8-5 provides that: "[a] person commits the offense of theft of services when by deception and with the intent to avoid payment he knowingly obtains services, accommodations, entertainment, or the use of personal property which is available only for compensation." Appellant argues that the State failed to show the required element of criminal intent to avoid payment on the part of the appellant and that the evidence could support only a finding that appellant made a bad business decision, resulting in appellant's convictions for theft of services representing an unconstitutional imprisonment for debt. We disagree.

> [I]ntent is a question of fact for jury resolution. *Farlow v. State*, 59 Ga. App. 881, 883 (1) (2 SE2d 500) (1939). Intent may be proven by circumstantial evidence, by conduct, demeanor, motive, and all other circumstances. *Harp v. State*, 136 Ga. App. 897, 900 (3) (a) (222 SE2d 623) (1975).

*Kennon v. State*, 232 Ga. App. 494, 496 (3) (502 SE2d 330) (1998). In this case, appellant testified that, when the winners' checks were written on Sunday night, he knew that there were insufficient funds in SMC's checking account to cover the amount of the checks. Appellant and his partners placed "stop payment" orders on the winners' checks when the bank opened the next day. Testimony was offered by victims, business associates, and the bankruptcy trustee from which the jury could infer that the appellant had the requisite criminal intent to commit theft of services as proscribed by the statute.

The evidence showed that, at the time of this race, SMC was in bankruptcy; had no cash reserves; had monumental pre-bankruptcy and post-bankruptcy debts; and could pay the winners' purses and other debts of the race only from the cash flow, including profits that the event generated, if there was sufficient attendance. The evidence further showed that it should have been evident to appellant and his partners from the inception of the racing event that, because of the low turnout of both drivers and spectators, the event would not be profitable. Further, during the course of the event, several drivers voiced their concerns to appellant that there would not be sufficient

funds to pay the winners' purses, and they were assured by appellant that the race track was solvent and they would be paid. When appellant was urged either to call off the race or to scale back the race, appellant refused. The evidence further showed that there was not sufficient cash to pay George Echols on Saturday night and that, in order to keep Echols from canceling the performance of the Winged Outlaws, appellant and his partners issued Echols a check for the balance he was due and assured him the check was "good," knowing at such time that there were insufficient funds in their business account to cover the amount due on the check. Thus, appellant knew, prior to the Sunday races, that there were insufficient funds to pay the purses.

Further, the State put up evidence that the cash received that weekend was handled differently than in previous races. Clint Sloan testified that he and another law enforcement officer normally would stay each night after a race while the appellant and his partners counted the cash; Sloan then would take the cash and deposit it in the bank. After this particular race, Sloan was not requested to stay and did not make any deposits for appellant and his partners.

The bankruptcy trustee's testimony showed that, up until the time SMC filed bankruptcy, appellant received a net salary of over $2,500 per week; that, even though appellant's salary was in excess of $100,000 per year, the business mortgage and taxes were not paid; and that, post-bankruptcy, the business mortgage and taxes still were not paid, and thousands of dollars were owed to vendors. Further, the bankruptcy trustee testified that, post-bankruptcy, appellant received several checks in large amounts that did not appear to be payroll checks, and that one check indicated it was for cash; that appellant took tires from SMC and sold them in Florida; and that appellant contacted at least one customer and requested that payment be made directly to SMC. Such evidence was sufficient within the meaning of *Jackson v. Virginia*, supra, to show intent and support the verdict.

(b) OCGA § 16-8-2 provides that:

[a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated.

Wendall Bearden, president of Bearden Oil Company, testified that, on Thursday, October 26, 1995, he delivered race fuel to the raceway and that appellant and his partners sold this fuel at the raceway to the drivers of the race cars for a profit. The cost of the fuel

was $2,856, and Bearden required cash payment for the fuel by appellant and his partners at the time of delivery. At delivery, appellant and his partners wrote Bearden a check for the amount due. When Bearden presented the check to a bank for payment, payment on the check had been stopped by appellant and his partners. Bearden further testified that he had not been paid for the fuel at the time of trial and that any unused portion of the fuel was not returned to him. From such evidence, the jury was authorized to find that appellant and his partners issued a check they had no intention to honor in order to induce Bearden to deliver the fuel.[4] The foregoing evidence, construed in a light most favorable to the jury's verdict, was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of theft by taking. *Jackson v. Virginia*, supra.

2. Appellant also enumerates as error the trial court's denial of his motion for new trial. In his motion for new trial, appellant sets out five grounds on which he contends the trial court should grant him a new trial. Grounds one through four clearly go to the sufficiency of the evidence, and our ruling in Division 1 is dispositive of these grounds. To the extent ground five can be construed to set forth an ineffective assistance of counsel claim, appellant did not support this assertion in his brief with any argument or citation to the record. Accordingly, this assertion is deemed abandoned. Court of Appeals Rule 27 (c) (2); *Luxenberg v. Griffith*, 237 Ga. App. 201, 202 (514 SE2d 63) (1999).

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED SEPTEMBER 13, 1999 —
RECONSIDERATION DENIED SEPTEMBER 29, 1999 — 

*Christopher J. McFadden*, for appellant.
*Lydia J. Sartain, District Attorney, Lee Darragh, Assistant District Attorney*, for appellee.

---

[4] Appellant's reliance on *Elliott v. State*, 149 Ga. App. 579 (254 SE2d 900) (1979), and *Gill v. State*, 197 Ga. App. 558 (398 SE2d 833) (1990), is misplaced. In this case, appellant was to pay cash at the time of delivery. In both *Elliott* and *Gill* the defendant was allowed to take possession of the goods with the promise of payment in the future.